293 F.3d 213
 Ricardo Antonio WELCH, Jr., Petitioner-Appellee,
v.
John ASHCROFT, as Attorney General, Department of Justice; James W. Ziglar, as Commissioner of the Immigration and Naturalization Service, Department of Justice; Louis D. Crocetti, Jr., as Director, Baltimore District, Immigration and Naturalization Service; Douglas C. Devenyns, as Warden, Wicomico County Detention Center, Respondents-Appellants.
Citizens and Immigrants for Equal Justice; American Immigration Lawyers Association; American Civil Liberties Union Foundation, Immigrants' Rights Project, Amici Curiae.
 No. 00-7665.
 United States Court of Appeals, Fourth Circuit.
 Argued June 5, 2001.
 Decided June 19, 2002.
 
 COPYRIGHT MATERIAL OMITTED ARGUED: Earle Bronson Wilson, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for Appellants. Mary Ellen Fleck, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Washington, D.C., for Appellee. ON BRIEF: Stuart E. Schiffer, Acting Assistant Attorney General, Emily Anne Radford, Assistant Director, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for Appellants. Todd M. Stenerson, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Washington, D.C., for Appellee. Michael Maggio, Maggio & Kattar, P.C., Washington, D.C.; Marvin E. Frankel, Jennifer L. Rochon, Kramer, Levin, Naftalis & Frankel, L.L.P., New York, New York; Nancy Morawetz, Washington Square Legal Services, Inc., New York University School of Law, New York, New York, for Amici Curiae Citizens & Immigrants and Immigration Lawyers. Judy Rabinowitz, Immigrants' Rights Project, American Civil Liberties Union Foundation, New York, New York; Liliana M. Garces, Immigrants' Rights Project, American Civil Liberties Union Foundation, Oakland, California, for Amicus Curiae Foundation.
 Before WIDENER and WILLIAMS, Circuit Judges, and BEEZER, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.
 Affirmed by published opinion. Senior Judge BEEZER wrote the opinion. Judge WIDENER wrote an opinion concurring in Judge BEEZER's opinion except for the first paragraph of Part III A. 1. and Part VI. and concurring in the judgment. Judge WILLIAMS wrote an opinion concurring in the judgment.
 OPINION
 BEEZER, Senior Circuit Judge.
 
 
 1
 Attorney General John Ashcroft, Commissioner of the Immigration and Naturalization Service James W. Ziglar, Director of the Immigration and Naturalization Service's Baltimore District Louis D. Crocetti, Jr., and Director of the Wicomico County Detention Center Douglas C. Devenyns (collectively "DOJ") appeal the district court's grant of a petition by Ricardo Antonio Welch, Jr. ("Welch") for a writ of habeas corpus. 101 F.Supp.2d 347 (D.Md. 2000). We have jurisdiction pursuant to 28 U.S.C. §§ 1292(a)(1) & 2253. See INS v. St. Cyr, 533 U.S. 289, 313-15, 121 S.Ct. 2271, 2287, 150 L.Ed.2d 347 (2001). We affirm.
 
 
 2
 * Welch is a citizen of Panama who has been a permanent legal resident in the United States since he was ten years of age. Welch's parents, siblings and son are United States citizens. Welch served in the United States Navy and Naval Reserve for six years and was honorably discharged in 1994.
 
 
 3
 In the same year, Welch pleaded guilty to four State felony counts in Maryland. While Welch was in State custody, the DOJ instituted deportation[1] proceedings against him and served him with an Order to Show Cause. The DOJ asserted that Welch was deportable pursuant to two subsections of former section 241 of the Immigration and Naturalization Act based on his State felony convictions. See 8 U.S.C. § 1251(a)(2)(A)(iii) (1994) (authorizing deportation for conviction for "aggravated felony"); id. § 1251(a)(2)(C) (authorizing deportation for conviction for unlawfully possessing or carrying firearm).[2]
 
 
 4
 Soon after Welch was released from State custody, an immigration judge ordered Welch removed to Panama pursuant to former section 241(a)(2)(A)(iii) of the Immigration and Naturalization Act. Welch appealed the removal order to the Board of Immigration Appeals. The Board rejected Welch's appeal. The DOJ placed Welch in detention pending removal. Welch's removal was delayed pending receipt of necessary documents from the government of Panama.
 
 
 5
 A Maryland court vacated Welch's felony convictions on the ground of ineffective assistance of counsel. Maryland entered into a new plea bargain with Welch and dropped the felony charges against him. Welch pleaded guilty to six misdemeanor charges of simple assault and one misdemeanor charge of illegally wearing or carrying a handgun. The State court imposed a combined sentence of less than one year and credited Welch with time served for the entire sentence.
 
 
 6
 The DOJ ceased attempts to enforce the prior removal order that had relied upon the vacated felony convictions. The DOJ moved to reopen Welch's removal proceedings on the ground that Welch's new firearm misdemeanor conviction rendered him deportable under former section 241(a)(2)(C) (now 237(a)(2)(C)) of the Immigration and Naturalization Act, 8 U.S.C. § 1227(a)(2)(C) (2001). The DOJ continued to detain Welch on the ground that § 236(c) of the Immigration and Naturalization Act, 8 U.S.C. § 1226(c) (2001), as amended by the Antiterrorism and Effective Death Penalty Act of 1996, mandated Welch's detention pending a final removal determination. The Board of Immigration Appeals granted the DOJ's motion to reopen. The DOJ served Welch with an amended Order to Show Cause relying on § 237(a)(2)(C) of the Immigration and Naturalization Act and his misdemeanor firearm conviction.
 
 
 7
 Welch filed a petition for a writ of habeas corpus with the United States District Court for the District of Maryland. He also applied for naturalization as a United States citizen.
 
 
 8
 An immigration judge terminated Welch's reopened removal proceedings without prejudice based on the likely success of Welch's naturalization application and the presence of "exceptionally appealing humanitarian factors." The DOJ appealed. The Board of Immigration Appeals reversed and remanded.
 
 
 9
 The district court granted Welch's habeas petition. 101 F.Supp.2d at 356. Relying on United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), the district court held that § 236(c) of the Immigration and Naturalization Act "violated Welch's substantive due process right, while detained pending judicial proceedings, to receive a bail hearing in which a judge would determine his flight risk and threat to the community." Id. The court ordered the DOJ to "provide Welch with a bail hearing before an immigration judge." Id.
 
 
 10
 An immigration judge conducted a bail hearing pursuant to the district court's order. The immigration judge concluded that Welch did not pose a flight risk or community danger so as to preclude his release pendente lite. The immigration judge ordered Welch enlarged on $1,500 bond. So far as the record reveals, Welch remains free from incarceration.
 
 
 11
 An immigration judge sua sponte ordered Welch removed based on the amended Order to Show Cause. Welch and the DOJ jointly moved in the district court to set aside this second removal order on the ground that Welch had become eligible for discretionary cancellation of removal. Immigration and Naturalization Act § 240A, 8 U.S.C. § 1229b. The district court granted the unopposed motion. Welch's removal proceedings remain open.
 
 
 12
 The DOJ appeals the district court's order directing it to provide Welch with a bail hearing with respect to his detention pendente lite.
 
 II
 
 13
 The DOJ claims that Welch, as a removable alien, must be detained without possibility of release pending a final removal determination, pursuant to § 236(c) of the Immigration and Naturalization Act, 8 U.S.C. § 1226(c). Aliens in removal proceedings are generally eligible for discretionary release pendente lite unless restricted by § 236(c). See Immigration and Naturalization Act § 236(a). Subsection 236(c) says:
 
 
 14
 (1) Custody. The Attorney General shall take into custody any alien who —
 
 
 15
 . . . .
 
 
 16
 (B) is deportable by reason of having committed any offense covered in section 1227 (a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
 
 
 17
 . . . .
 
 
 18
 when the alien is released [upon serving his sentence],[3] without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.
 
 
 19
 (2) Release. The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides ... that release of the alien from custody is necessary [under the federal witness protection program statute, 18 U.S.C. § 3521], and the alien satisfies the Attorney General that the alien will not pose a danger ... and is likely to appear for any scheduled proceeding.
 
 
 20
 Immigration and Naturalization Act § 236(c), 8 U.S.C. § 1226(c) (emphasis added). The offenses enumerated in § 236(c)(1)(B) include misdemeanors for carrying a firearm. See 8 U.S.C. § 1227(A)(2)(C). Subsection 236(c) categorically bars the Attorney General from "releas[ing] from custody" any alien convicted of an aggravated felony or firearm offense who is not in the federal witness protection program.
 
 
 21
 Although the DOJ maintains that Welch is deportable, his removal is not certain. The DOJ does not challenge the district court's ruling that the permanent rules under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 apply to Welch's agency proceedings. The permanent rules, unlike the transitional rules that initially applied to removal proceedings following passage of the Illegal Immigration Reform and Immigrant Responsibility Act, permit Welch to apply for cancellation of removal so long as he has no felony convictions for purposes of the Immigration and Naturalization Act. See Immigration and Naturalization Act § 240A, 8 U.S.C. 1229b(a) (2001). A successful application for either citizenship or cancellation of removal will effectively terminate the DOJ's current efforts to remove Welch.
 
 III
 
 22
 The district court held that detention of Welch pendente lite without the opportunity for a bail hearing violated his right to due process. "[T]he Fifth Amendment entitles aliens to due process of law in deportation proceedings." Reno v. Flores, 507 U.S. 292, 306, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). The substantive component of due process "forbids [legislation] to infringe certain `fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." Id. at 301-02, 113 S.Ct. 1439; see Hawkins v. Freeman, 195 F.3d 732, 739 (4th Cir.1999) (en banc). Infringements of liberty interests that are not fundamental are subject to less exacting scrutiny. See Washington v. Glucksberg, 521 U.S. 702, 722, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997).[4]
 
 A.
 
 23
 We begin our due process analysis with the history, practice, and legal tradition of the liberty interest claimed by Welch. Glucksberg, 521 U.S. at 710, 117 S.Ct. 2258; Hawkins, 195 F.3d at 739. As "[t]here is no general liberty interest in being free of even the most arbitrary and capricious government action," we are required to "carefully state[]" the liberty interest that we consider. Hawkins, 195 F.3d at 739. "By this means, the Nation's history, legal traditions, and practices ... provide the crucial guideposts for responsible decisionmaking, that would be threatened by analyzing the claimed right at too general a level." Id. (internal quotation marks and citations omitted). Central to our due process inquiry, Welch's detention raises the question whether a person has a constitutional right to freedom from incarceration absent a judicial finding of unacceptable flight risk or danger to the community, where probable cause for removal from the United States exists but a final determination has not been made.
 
 1.
 
 24
 Traditional Anglo-American law generally provides an opportunity to seek release from governmental incarceration pendente lite. Blackstone acknowledges "[t]he personal liberty of individuals ... without imprisonment or restraint, unless by due course of law" as an absolute personal right. 1 William Blackstone, Commentaries *134. Blackstone teaches that for a judicial officer "to refuse or delay to bail any person bailable, is an offence against the liberty of the subject ... by the common law: as well as by ... statute... and the habeas corpus act." 4 id. *297 (emphasis in original). See also Salerno, 481 U.S. at 749, 107 S.Ct. 2095 (noting "`general rule' ... that the government may not detain a person prior to a judgment of guilt in a criminal trial" subject to significant exceptions "in special circumstances").
 
 
 25
 Blackstone notes that every defendant is not "bailable" and suggests that the legislature can prohibit bail altogether. Id. But he also writes that a mandatory detention regime is unwise and was unknown in English law:
 
 
 26
 [T]he court of king's bench ... may bail for any crime whatsoever ... according to the circumstances of the case. And herein the wisdom of the law is very manifest. To allow bail to be taken commonly for . . . enormous crimes, would greatly tend to elude the public justice: and yet there are cases, though they rarely happen, in which it would be hard and unjust to confine a man in prison, though accused even of the greatest offence. The law has therefore provided one court, and only one, which has a discretionary power of bailing in any case . . . .
 
 
 27
 4 id. 299 (emphasis added).
 
 
 28
 Few reported American cases squarely address the right to bail pendente lite, apparently because of the rarity in American law of mandatory pretrial detention of adults of sound mind. See United States v. Melendez-Carrion, 790 F.2d 984, 988, 997 (2d Cir.1986) (opinion of Newman, J.). Most cases deal with pretrial detention with at least a discretionary avenue for release. See, e.g., Flores, 507 U.S. at 296; Salerno, 481 U.S. at 750, 107 S.Ct. 2095; Carlson v. Landon, 342 U.S. 524, 538, 72 S.Ct. 525, 96 L.Ed. 547 (1952). When mandatory detention statutes have appeared outside the capital context, they have generally met with a hostile reaction. Compare, e.g., United States v. Egorov, 319 F.2d 817 (2d Cir.1963) (per curiam) (upholding mandatory detention for aliens accused of capital crimes), with Chi Thon Ngo v. INS, 192 F.3d 390 (3d Cir.1999) (granting parole hearing to convicted aliens held in mandatory detention under final removal order).
 
 
 29
 We observe that a tradition permitting brief mandatory pretrial detention does exist in the area of interstate extradition. One court has stated that it is the "majority view" that a defendant detained on a State governor's warrant pending extradition to another State has no constitutional right to bail. Meechaicum v. Fountain, 696 F.2d 790, 792 (10th Cir.1983) (per curiam). This detention is justified, according to the Meechaicum court, in order to keep the detainee "readily available to be turned over to those who arrive to return him" to the other State for trial. Id.
 
 2.
 
 30
 The practice of mandatory detention of alien criminal convicts pending their final removal orders does not appear to have arisen in American law before the early part of the twentieth Century. In recent decades Congress has repeatedly revisited both the categories of crimes requiring alien deportation and the opportunities for such aliens' release pendente lite.[5] The Immigration Act of 1917 made aliens convicted of crimes of "moral turpitude" and receiving sentences of at least one year deportable. An Act to Regulate the Immigration of Aliens to, and the Residence of Aliens in, the United States, ch. 29, § 19, 39 Stat. 874, 889 (1917). Such aliens were eligible for discretionary bonded release pending adjudication. Id. § 20, 39 Stat. at 881. The Immigration and Nationality Act of 1952 added drug and firearm crimes to the list of deportable offenses. Immigration and Naturalization Act § 241(a)(4)(A). The statute also eliminated the bond requirement for release. Id. § 242(a)(1)(C).
 
 
 31
 In 1988, the Anti Drug Abuse Act created the "aggravated felon" category of deportable alien. Anti Drug Abuse Act § 7342, amending Immigration and Naturalization Act § 101(a), 8 U.S.C. § 1251(a) (1988); see 8 U.S.C.S. § 1101 note. The Anti Drug Abuse Act required alien detention pending a final deportation order. 8 U.S.C. § 1252(a)(2) (1988). This mandatory detention provision, apparently the first in American immigration law, was quickly amended to apply only to felons who had not been lawfully admitted to the United States. Id. (1992); see 8 U.S.C.S. § 1101 note (1992).
 
 
 32
 In 1996, the Antiterrorism and Effective Death Penalty Act expanded the list of crimes requiring detention and removal and eliminated the Anti Drug Abuse Act's exception for lawful entrants. Antiterrorism and Effective Death Penalty Act § 306(a)(2), 440(c)(1), 8 U.S.C. § 1252 (1996). The Illegal Immigration Reform and Immigrant Responsibility Act temporarily restored the exception a few months later.[6] Illegal Immigration Reform and Immigrant Responsibility Act § 303(b)(3). After the transitional rules under that Act expired in 1998, both lawfully and unlawfully admitted aliens with criminal convictions requiring deportation once more faced mandatory detention pending their final removal orders. Illegal Immigration Reform and Immigrant Responsibility Act § 236(c), 8 U.S.C. § 1226(c) (1999).[7]
 
 B.
 
 33
 Welch asserted in the district court that his mandatory incarceration implicates a fundamental liberty interest. 101 F.Supp.2d at 353. Welch cited Salerno for the proposition that strict scrutiny is applicable. Id. at 354. The DOJ argued that only rational basis review applies, citing Reno v. Flores, 507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). 101 F.Supp.2d at 353. The district court agreed with Welch and, relying on Salerno, decided that the liberty interest Welch asserts is fundamental and that strict scrutiny should be applied to detention pendente lite. Id.
 
 
 34
 The district court distinguishes the cases of Salerno and Welch from Flores. 101 F.Supp.2d at 353-54. Salerno upholds pretrial detention of dangerous persons accused of serious felonies. Flores holds that detention pendente lite of juvenile aliens convicted of crimes permitting deportation does not infringe a fundamental right. 101 F.Supp.2d at 354. The district court observes that the detainees in Flores, unlike Salerno or Welch, were juveniles and as such are "always in some form of custody." Id. (quoting Flores, 507 U.S. at 302, 113 S.Ct. 1439).
 
 
 35
 Concluding that a fundamental interest is infringed, the district court applies strict scrutiny to Welch's detention pursuant to § 236(c). 101 F.Supp.2d at 354-55. The district court holds that, under strict scrutiny, the Government's "admitted[]" interest in confining apparently dangerous and removable aliens prior to a removal determination does not justify § 236(c)'s "blanket, irrefutable presumption" prohibiting release pending adjudication. Id. at 354.[8]
 
 C.
 
 36
 We cannot accept the district court's conclusion of law that the right to be free from restraint pendente lite is so fundamental as to require strict scrutiny of § 236(c). In Salerno, the sole opinion on which the district court relied, the Supreme Court describes liberty from physical restraint as being of a "fundamental nature." 481 U.S. at 750, 107 S.Ct. 2095. But the Salerno Court goes on to say that it cannot "categorically state that pretrial detention `offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" 481 U.S. at 751, 107 S.Ct. 2095 (quoting Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934)). In Zadvydas v. Davis, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), the Court says that "[f]reedom from imprisonment-from government custody, detention, or other forms of physical restraint lies at the heart of the liberty th[e] [Fifth Amendment] protects." 121 S.Ct. at 2498. The Court neither calls that right "fundamental" nor holds that strict scrutiny applies. See also Foucha v. Louisiana, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (describing "freedom from physical restraint" as being "at the core of the Fifth Amendment," with only concurring opinion dubbing it "fundamental right").
 
 
 37
 The liberty interest implicated by incarceration pending a final removal order is unquestionably significant. Yet the Supreme Court has never added freedom from incarceration to the short list of fundamental rights. The DOJ urges that we should find a fundamental liberty interest only with the greatest caution. We agree.
 
 
 38
 The very flexibility of due process leaves us "reluctant to expand the concept" into uncharted areas. Hawkins, 195 F.3d at 738. The separation of powers that "keeps courts without certain traditional bounds vis-a-vis the other branches," Lewis v. Casey, 518 U.S. 343, 353 n. 3, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), has particular force in immigration and removal:
 
 
 39
 Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution. The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress ... in the area of immigration and naturalization.
 
 
 40
 Palma v. Verdeyen, 676 F.2d 100, 104 (4th Cir.1982) (quoting Mathews v. Diaz, 426 U.S. 67, 81-82, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976)).
 
 
 41
 The word "fundamental" is in any event a term of art employed to "rein in the subjective elements that are necessarily present in due-process judicial review" and to promote the "balancing of competing interests in every [such] case." Hawkins, 195 F.3d at 739 n. 2 (quoting Glucksberg, 521 U.S. at 722, 117 S.Ct. 2258). The semantics of fundamental rights analysis must not finesse the central issue in this case: the circumstances, if any, under which Congress may deny bail to apparently deportable aliens.
 
 IV
 
 42
 If detention of alien convicts pending removal does not implicate a fundamental liberty interest, we apply a less exacting inquiry to determine whether § 236(c) comports with substantive due process. Although there can be "no mechanical test" for due process, Shirley v. State, 528 F.2d 819, 822 (4th Cir.1975), the Supreme Court and we employ a consistent inquiry when testing detention pendente lite against due process guarantees. See Hill v. Nicodemus, 979 F.2d 987, 990-91 (4th Cir.1992); Flores, 507 U.S. at 303, 113 S.Ct. 1439; Salerno, 481 U.S. at 746-47, 107 S.Ct. 2095. First, such detention must be reasonably related to legitimate government interests. Second, "[i]t is axiomatic that `[d]ue process requires that a pretrial detainee not be punished.'" Schall v. Martin, 467 U.S. 253, 269, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) (quoting Bell v. Wolfish, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Detention pendente lite must not "constitute[] impermissible punishment before [adjudication]" but must instead be merely a non-punitive, "regulatory" measure. We consider
 
 
 43
 whether the [detention] is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an express intent to punish on the part of the State, that determination generally will turn on [(1)] whether an alternative purpose to which [the disability] may rationally be connected is assignable for it, and [(2)] whether it appears excessive in relation to the alternative purpose....
 
 
 44
 Martin, 467 U.S. at 269, 104 S.Ct. 2403. Accord Flores, 507 U.S. at 303, 113 S.Ct. 1439; Salerno, 481 U.S. at 747, 107 S.Ct. 2095; Hill, 979 F.2d at 990-91; see also Zadvydas, 121 S.Ct. at 2498-99 (holding that civil detention in general requires special non-punitive circumstances that outweigh detainee's liberty interest in freedom from physical restraint) (citing Kansas v. Hendricks, 521 U.S. 346, 356, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997)).
 
 A.
 
 45
 The mandatory detention statute, on its face, reveals no punitive intent. Deportation itself is not punitive. Flemming v. Nestor, 363 U.S. 603, 616, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). Mandatory detention pending a final removal decision bears a reasonable relationship to legitimate government interests. Despite the lack of express punitive intent, however, the statute may still be punitive if it has no purpose other than punishment, or is excessive in light of its goals. See Martin, 467 U.S. at 269, 104 S.Ct. 2403.
 
 
 46
 The DOJ asserts two principal interests in support of § 236(c).
 
 
 47
 First, mandatory detention reduces the flight risk of aliens facing probable removal. The DOJ points to Congressional findings and reports to the effect that aliens facing removal pose significant flight risks. See, e.g., Sen. William V. Roth, Jr., Criminal Aliens in the United States, S.Rep. No. 104-48 (April 7, 1995), reprinted in 1995 WL 170285 (finding that 20 percent of criminal aliens not detained pendente lite fail to appear for deportation hearings). Although Congress has a legitimate interest in lowering convicted aliens' flight risk and § 236(c) furthers this goal, the constitutionality of the statute cannot rest on this interest alone. The Supreme Court has said that a concern over flight risk, however legitimate, cannot by itself justify mandatory detention before trial. See Salerno, 481 U.S. at 754-55, 107 S.Ct. 2095. "When the Government['s] ... only interest is in preventing flight, bail must be set by a court at a sum designed to ensure that goal, and no more." Id. at 754, 107 S.Ct. 2095 (emphases added); see also Kansas v. Hendricks, 521 U.S. 346, 358, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) ("A finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment").
 
 
 48
 The DOJ asserts a second important interest. The Government seeks to protect the community from wrongful acts by dangerous aliens facing expulsion. Danger is certainly a matter of legitimate public concern. But here Congress bases the presumption of dangerousness on prior acts, in the form of prior convictions. The sentence for these convictions has already been imposed by a State court and served by Welch. Mandatory detention based on prior convictions, in a civil removal proceeding, must not add to the punishment administered for those convictions in the first place. See Martin, 467 U.S. at 269, 104 S.Ct. 2403.
 
 
 49
 Both purposes relied upon by the Government appear to support mandatory detention under § 236(c). We next determine whether mandatory detention pendente lite based on a record of prior criminal conduct is a reasonable and not excessive way to prevent flight risk and to protect the community. See Martin, 467 U.S. at 269, 104 S.Ct. 2403; Hill, 979 F.2d at 990-91. We analyze the statute both on its face and as applied to Welch.
 
 B.
 
 50
 "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." Salerno, 481 U.S. at 745, 107 S.Ct. 2095. We cannot say that mandatory detention pendente lite of aliens convicted of crimes involving violence, contraband or dangerous instrumentalities violates due process on its face.
 
 
 51
 A total bar against individual findings of "dangerous" is without question a blunt tool by which to restrict personal liberty. Carlson, 342 U.S. at 538 & n. 31, 72 S.Ct. 525. On the other hand, mandatory detention here is based upon prior convictions, which enjoy a unique status in due process analysis. At least in the criminal context, "any fact other than a prior conviction that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 477, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (quoting Jones v. United States, 526 U.S. 227, 243 n. 6, 119 S.Ct. 1215, 143 L.Ed.2d 311) (parentheses omitted) (emphasis added). It follows that prior convictions as a basis for regulatory detention require fewer due process safeguards as well. "One basis for [this] ... constitutional distinction is not hard to see: unlike virtually any other consideration used to enlarge the possible [deprivation]... a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt, and jury trial guarantees." Jones, 526 U.S. at 249, 119 S.Ct. 1215.
 
 
 52
 An infringement of liberty on account of past acts suggests that the purpose of the infringement may be punitive rather than regulatory. See Nestor, 363 U.S. at 619-20, 80 S.Ct. 1367. But present consequences based on past acts are not always punitive and often serve purely regulatory purposes. Basing detention here on carefully defined categories of past convictions provides a clear, definite standard for § 236(c)'s applicability. See Carlson, 342 U.S. at 543, 72 S.Ct. 525 (noting that clear standards for physical detention can be salutary for due process purposes).
 
 
 53
 State or federal convicts subject to § 236(c) may reasonably be assumed to have in fact performed the dangerous acts that constitute the crimes for which they were convicted. Aliens committing such acts should be aware that doing so may subject them to drastic and unwelcome consequences above and beyond mere judicial punishment, up to and including removal. Persons facing removal have predictable incentives to abscond from custody and predictable indifference to lesser penalties for future wrongful acts committed within the jurisdiction of the United States.
 
 
 54
 Historically, the Government faces significant practical and administrative challenges in dealing with aliens. Congress' power to act is at its height in the context of foreign affairs in general and immigration in particular. See Rostker v. Goldberg, 453 U.S. 57, 64, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981); Fiallo v. Bell, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977). So long as § 236(c) of the Immigration and Naturalization Act does not violate the Constitution's guarantees, the legislative intent will be given effect. See Fiallo, 430 U.S. at 792, 97 S.Ct. 1473; Carlson, 342 U.S. at 537, 72 S.Ct. 525.
 
 
 55
 The mandatory detention pendente lite of apparently deportable aliens does not violate due process under every possible set of circumstances. We are not able to sustain Welch's facial challenge to § 236(c).
 
 C.
 
 56
 We examine Welch's particular circumstances to determine whether the statute violates due process as applied in his case. We conclude that it does. Fourteen months of incarceration pendente lite of a longtime resident alien with extensive community ties, with no chance of release and no speedy adjudication rights as in criminal proceedings, together lead us to conclude that the circumstances of Welch's detention constitute punishment without trial.
 
 1.
 
 57
 The DOJ insists that Welch, as an alien convicted of a firearm crime, is not entitled to the full panoply of due process rights. The DOJ points to Parra v. Perryman, 172 F.3d 954 (7th Cir.1999), the first reported circuit case to address the constitutionality of § 236(c). In Parra, a criminal alien in the United States challenged § 236(c) on due process grounds. 172 F.3d at 955-56. The Parra court relies upon Congress' plenary power over aliens to uphold the statute. Id. at 958. In light of the Supreme Court's later clarification of this plenary power doctrine in Zadvydas, we decline to adopt Parra's reasoning.
 
 
 58
 We repeat the axiom that "Congress has virtually plenary authority over the admission of aliens." Palma, 676 F.2d at 103. "Over no conceivable subject is the legislative power of Congress more complete," and in the immigration area "Congress regularly makes rules that would be unacceptable if applied to citizens." Fiallo, 430 U.S. at 792, 97 S.Ct. 1473. In Zadvydas, however, the Supreme Court says that the plenary power doctrine is largely inapplicable to aliens who have already entered the United States, even after becoming subject to a final removal order. 121 S.Ct. at 2500-02. Zadvydas thus rejects the proposition, on which the Parra court squarely relies,[9] that aliens under final removal orders have forfeited any "legal right to remain in the United States." Compare Parra, 172 F.3d at 958, with Zadvydas, 121 S.Ct. at 2502.
 
 
 59
 The plenary power doctrine does not become entirely inapplicable to aliens once they have entered the United States. See, e.g., Flores, 507 U.S. at 305-06, 113 S.Ct. 1439 (relying in part on plenary power doctrine to uphold brief detention of dangerous juvenile aliens pending adjudication); Carlson, 342 U.S. at 542-43, 72 S.Ct. 525 (relying on doctrine to uphold detention of dangerous Communist aliens pending adjudication); see also Palma, 676 F.2d at 104. But "once an alien gains admission to this country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly." Vancouver Women's Health Collective Soc'y v. A.H. Robins Co., 820 F.3d 1359, 1363 (4th Cir.1987). See also United States v. Verdugo-Urquidez, 494 U.S. 259, 271, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (noting that voluntarily resident aliens who develop strong domestic ties enjoy strengthened civil rights).
 
 
 60
 Zadvydas requires us to consider whether Welch, as a longtime resident alien with extensive domestic connections, is entitled to the due process protections that citizens enjoy.
 
 2.
 
 61
 The governmental interests supporting detention pendente lite are relatively slight in Welch's case. Little flight risk appears. Welch has never sought to elude the INS despite being at liberty for months while appealing his first removal order. The DOJ does not contest the immigration judge's express finding that his case presents "exceptionally appealing humanitarian factors." and that his naturalization application is likely to succeed. Where flight risk is concerned, "[t]here is a clear difference... between facing possible deportation and facing certain deportation." St. Cyr, 121 S.Ct. at 2293 (emphases added).
 
 
 62
 The record provides little support for a dangerous alien finding. Welch's criminal record in Maryland, consisting entirely of misdemeanors, provides the only record evidence that Welch is anything but a credit to his community.[10] The record before us provides thin support for an irrebuttable presumption that Welch is so dangerous as to preclude his release pending resolution of his civil removal proceeding.
 
 
 63
 In Kofa v. United States INS, 60 F.3d 1084 (4th Cir.1995) (en banc), we employed "two principles of statutory construction[,] plain English and common sense," to explain the operation of a statute barring discretionary cancellation of removal for aggravated felons. Id. at 1088. We interpreted the statute as establishing a presumption that an "alien constitutes a danger to the community because he has been convicted of a particularly serious crime, so once the particularly serious crime determination is made, the alien is ineligible for [cancellation] without a separate finding on dangerousness." Id. (emphasis added). In other words, the reason that aggravated felony convictions may form a sensible basis for a rebuttable presumption of dangerousness is that an aggravated felony is a "particularly serious crime." We doubt that common sense similarly permits an irrebuttable presumption of dangerousness based on a single firearm misdemeanor.
 
 
 64
 The DOJ urges us to consider not just Welch's misdemeanor plea, but also the dangerous acts underlying his vacated felony convictions. But the DOJ has already conceded this argument. We agree that expunged State convictions may remain convictions for purposes of the Immigration and Naturalization Act so long as there was both (1) a finding or confession of guilt and (2) a punishment imposed. See Immigration and Naturalization Act § 101(a)(48)(A), 8 U.S.C. § 1101(a)(48)(A) (2001).[11] But the DOJ has abandoned enforcement of Welch's first removal order. The DOJ did not appeal the district court's ruling that Welch is eligible to apply for cancellation of removal under § 240A of the Immigration and Naturalization Act, 8 U.S.C. § 1229b(A), even though cancellation is expressly made available only to removable aliens with no aggravated felony convictions for purposes of the Act. In fact, the DOJ joined Welch's motion to stay his removal proceeding on the explicit ground that he was eligible for § 240A cancellation. The DOJ cannot contend that Welch's vacated convictions are irrelevant to whether he should be removed, yet relevant to whether he is dangerous pending a removal determination.
 
 
 65
 Finally, we examine the length of Welch's detention to determine whether it is "excessive" in relation to the statute's goals. The point at which extended detention pendente lite will violate due process depends upon such factors as the nature of the deprivation, see Nestor, 363 U.S. at 617, 80 S.Ct. 1367; Wong Wing v. United States, 163 U.S. 228, 241, 16 S.Ct. 977, 41 L.Ed. 140 (1896); the conditions of confinement, see Martin, 467 U.S. at 270, 104 S.Ct. 2403; Bell, 441 U.S. 520, 536-37, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); the procedures afforded detainees prior to adjudication, see Baker v. McCollan, 443 U.S. 137, 145, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); Gerstein v. Pugh, 420 U.S. 103, 112-13, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); and the justification for the continued detention. See Bell, 441 U.S. at 539-40, 99 S.Ct. 1861; United States v. Johnson, 732 F.2d 379, 381 (4th Cir.1984). The actual length of the detention is a cornerstone of the inquiry. See Zadvydas, 121 S.Ct. at 2503.
 
 
 66
 The short maximum duration of most pretrial detention statutes is significant. See, e.g., Martin, 467 U.S. at 270, 104 S.Ct. 2403 (17 days); United States v. Edwards, 430 A.2d 1321 (D.C.App.1981) (en banc) (60 days). Long pretrial detentions are generally upheld only where the detainee's own aggressive procedural tactics are the chief cause of the delay. See, e.g., Doherty v. Thornburgh, 943 F.2d 204 (2d Cir.1991) (8 years); Dor v. Dist. Dir., 891 F.2d 997 (2d Cir.1989) (5 years).
 
 
 67
 In Zadvydas, the Supreme Court questions the constitutionality of the detention of aliens after a final removal order but before actual removal. 121 S.Ct. at 2503. Detention pending actual removal features a clearly identifiable event marking completion of the administrative process: actual removal. Nevertheless, Welch enjoys the benefit of no deadline by which actual removal must be accomplished following a final removal order, and removal may prove entirely impracticable. The Zadvydas Court stresses repeatedly that post-order detention may be "indefinite, perhaps permanent." Id. Welch's detention pending a final removal order is similarly indefinite. Like the postorder detention in Zadvydas, Welch's detention features a clearly identifiable event marking completion of the detention period (i.e., issuance of a final order), but no clearly identifiable deadline by which that event must take place.[12] Also, like the aliens in Zadvydas, Welch is not himself the cause of the delay in completion.
 
 
 68
 The Speedy Trial Act, 18 U.S.C. §§ 3161 et seq., adopts a presumptive limit of 90 days for pretrial detention in the criminal context. Congress has adopted the same 90 day limit for the mandatory detention of deportable aliens like Welch after they are finally ordered removed. 8 U.S.C. § 1231(a)(2); see Zadvydas, 121 S.Ct. at 2495. Post-order detention of aliens may continue past 90 days, but only after an individual administrative review. 121 S.Ct. at 2495. In Zadvydas, the Court imposes a presumptive six-month upper limit on even this optional detention period. Id. at 2505.
 
 
 69
 Welch, a prima facie deportable alien, does not present as compelling a case for either mandatory or discretionary detention as the aliens in Zadvydas, who were convicted felons already subject to final removal orders. Yet Welch's 14 months in detention is five months longer than the 90 day § 1231(a)(2) and six-month Zadvydas limits combined.
 
 
 70
 We consider fourteen months' incarceration before adjudication, as applied to Welch, to fall outside any range that comports with due process in these circumstances.
 
 V
 
 71
 The district court's grant of Welch's petition did not trench upon executive discretion, for no such discretion existed. The district court judgment does not order the DOJ to release Welch from custody. The judgment merely orders a bail hearing. The DOJ was able to present, and the immigration judge was free to consider, evidence of flight risk and dangerousness at the bail hearing. Yet the immigration judge found Welch fit for release and enlarged him on relatively minimal bond.
 
 
 72
 As a political branch enacting broad statutes, Congress can neither foresee nor address every conceivable set of circumstances under which government power is exercised against individuals. Where Congress eliminates executive discretion, courts remain as defenders of personal liberty in individual situations. The separation of powers is not offended by directing the executive administrative process to include bail hearings pendente lite in removal proceedings.
 
 VI
 
 73
 Welch's 14-month detention without a bond hearing did not contravene the dictates of § 236(c). After carefully considering all the circumstances reflected in the record, we are convinced that Welch's detention constitutes punishment without the benefit of a trial. The district court's judgment granting Welch's petition for a writ of habeas corpus is
 
 
 AFFIRMED.
 [13]
 
 
 
 Notes:
 
 
 [1]
 The terms "deportation" and "removal" are synonymous in this opinion
 
 
 [2]
 In 1996 Congress recodified former § 241 of the Immigration and Naturalization Act, 8 U.S.C. § 1251 (1994), in substantially identical form at § 237 of the Act as amended, 8 U.S.C. § 1227 (2001)
 
 
 [3]
 Welch completed his sentence for his now-vacated felony convictions in 1996, before § 236(c) took effect. Nevertheless, we agree with the district court's conclusion that § 236(c) applies to WelchSee 101 F.Supp.2d at 352-52. In 1999, from the time Welch entered his second set of guilty pleas until he was resentenced, he was in the constructive custody of the State of Maryland. With resentencing came his "release."
 
 
 [4]
 Even substantively acceptable deprivations of liberty interests "must still be implemented in a fair manner."Salerno, 481 U.S. at 746, 107 S.Ct. 2095. But in Welch's case there is no procedure to implement. Bail pendente lite must be denied as a matter of law. The procedural due process inquiry collapses into the substantive one. See Kofa v. United States INS, 60 F.3d 1084, 1091 n. 7 (4th Cir.1995) (en banc).
 
 
 [5]
 A more detailed history of mandatory alien detention is found in Sen. William V. Roth, Jr.,Criminal Aliens in the United States, S.Rep. No. 104-48 (April 7, 1995), reprinted in 1995 WL 170285.
 
 
 [6]
 The detention provision of the Immigration and Naturalization Act, § 236(c), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act was originally intended to apply to all aliens placed in removal proceedings after April 1, 1997See Illegal Immigration Reform and Immigrant Responsibility Act § 303(b)(1). At the INS's request, Congress provided for a two-year grace period before § 236(c) took effect upon a showing that the INS lacked the resources to implement its mandatory detention requirements. The grace period was invoked on October 9, 1996. The "Transitional Period Custody Rules" in effect during the grace period temporarily restored the exception from mandatory detention pendente lite for lawful entrants that existed before the passage of the Antiterrorism and Effective Death Penalty Act of 1996.
 
 
 [7]
 Although we accept for purposes of this opinion the parties' position that § 236(c) of the Immigration and Naturalization Act mandates Welch's incarceration, we note that the provision may arguably be interpreted differently. Subsection 236(c) bars only "releasefrom custody." § 236(c)(2). But "custody" need not rise to the level of physical detention. See Taylor v. Taintor, 16 Wall. (83 U.S.) 366, 371, 21 L.Ed. 287 (1873) ("When bail is given, the principal is regarded as delivered to the custody of his sureties") (emphasis added). See also Albright v. Oliver, 510 U.S. 266, 278-79, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (Ginsburg, J., concurring) ("[A] defendant released pretrial ... is scarcely at liberty[;]... he remains apprehended, arrested in his movements, indeed `seized' for trial, so long as he is bound to appear in court and answer the state's charges"). Cf. Zadvydas v. Davis, 533 U.S. 678, 688-90, 121 S.Ct. 2491, 2498, 150 L.Ed.2d 653 (2001) ("[W]hen an Act of Congress raises a serious doubt as to its constitutionality, this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided").
 
 
 [8]
 The district court did not say whether it concluded that § 236(c) is unconstitutional on its face, as applied to Welch, or both. Welch argues here that the statute is invalid both on its face and as applied
 
 
 [9]
 Parra also argued, citing Flores and Carlson, that § 236(c)'s elimination of discretionary release reduces the statute's due process problems. 172 F.3d at 958. In fact, Flores and Carlson rely heavily on the existence and exercise of executive discretion as ameliorating the due process difficulties posed by detention pendente lite. See Flores, 507 U.S. at 309, 113 S.Ct. 1439; Carlson, 342 U.S. at 538 & n. 31, 72 S.Ct. 525.
 
 
 [10]
 We note the absence of any claim in the record that Welch's conduct has been that of a terrorist, or that he is or has ever been implicated in ongoing dangerous activities such as terrorism or organized crimeCf. Zadvydas, 121 S.Ct. at 2502 (noting that "terrorism or other special circumstances" might justify special "forms of preventive detention and ... heightened deference to the judgments of the political branch with respect to matters of national security").
 
 
 [11]
 We note, however, that § 101(a)(48)(A) of the Immigration and Naturalization Act was intended to address strictly rehabilitative expungements of otherwise valid convictionsYanez-Popp v. INS, 998 F.2d 231, 234-37 (4th Cir.1993). Welch's felony convictions were vacated, not for rehabilitative purposes, but for ineffective assistance of counsel.
 
 
 [12]
 Welch's detention would not necessarily end upon issuance of a final removal order. He would continue to be detained until actual removal is accomplished. We note that he has been subject to a previous final removal order once before, however, and that his actual removal to Panama proved impracticable on that occasion
 
 
 [13]
 As the record does not indicate that Welch has been returned to detention, we do not order his release pending issuance of the mandate. If Welch is in fact under detention, he may seek issuance of the writ from the district court
 
 
 WIDENER, Circuit Judge, concurring:
 
 74
 I concur in the result reached in the opinion of Judge Beezer, which is the decision of the court.
 
 
 75
 I concur in all of the opinion of Judge Beezer except the first paragraph of Part III A. 1. of the opinion which is found on page 8 of the circulated slip opinion, and the penultimate sentence of the text of the opinion found in Part VI thereof on page 22 of the circulated slip opinion.
 
 
 76
 For that part I have just mentioned with respect to Part III. A. 1., although in different context, I would substitute a discussion of the bail clause of the Eighth Amendment based on that found in Carlson v. Landon, 342 U.S. 524 at p. 545, 72 S.Ct. 525, 96 L.Ed. 547 (1952).
 
 
 77
 As for the sentence in Part VI of the opinion, I would substitute the following:
 
 
 78
 After carefully considering all the circumstances reflected in the record, we are of opinion that Welch is a more worthy plaintiff than Zadvydas, and, having been confined for more than 6 months, is entitled to the presumption outlined in Zadvydas v. Davis, 533 U.S. at 699-701, 121 S.Ct. 2491, that his continued detention is unlawful, the Attorney General having not shown there is a significant likelihood of removal in the reasonably foreseeable future.
 
 
 79
 I also emphasize an additional reason for my joining in the holding of this case that 8 U.S.C. § 1226(c) is invalid as applied to Welch. Although the Attorney General is the party in this case, as well as the government's attorney, he has not relied either on national security or foreign policy as a reason for the continued detention of Welch. In either of those fields, his wishes are virtually unassailable.
 
 
 80
 WILLIAMS, Circuit Judge, concurring in the judgment:
 
 
 81
 I agree with the majority's conclusion that 8 U.S.C.A. § 1226(c) (West 1999 & Supp.2001), while facially constitutional, is unconstitutional as applied to Welch. I also agree with the majority's rejection of a fundamental rights approach. I write separately to further illuminate the extent to which I believe Zadvydas v. Davis, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), should guide our resolution of this appeal.
 
 
 82
 * In Zadvydas, the Supreme Court evaluated the constitutionality of 8 U.S.C.A. § 1231(a)(6) (West 1999 & Supp.2001), which is the statutory provision applicable to "post-removal-period detention." Zadvydas, 533 U.S. at 683, 121 S.Ct. 2491. While recognizing that Congress has "broad power over naturalization and immigration," Mathews v. Diaz, 426 U.S. 67, 79-80, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), the Court reaffirmed the principle that Congress's authority over aliens is limited by the Due Process Clause. Zadvydas, 533 U.S. at 693, 121 S.Ct. 2491 ("[T]he Due Process Clause applies to all `persons' within the United States, including aliens."). Animated by the constitutional implications of a statute authorizing indefinite detention of aliens, the Zadvydas Court construed § 1231(a)(6) as containing an implicit reasonableness limitation and adopted six months as the threshold period by which habeas courts should evaluate the reasonableness of the post-removal-period detention, holding that after six months, detention would be considered presumptively unreasonable. Id. at 701, 121 S.Ct. 2491.
 
 II
 
 83
 Each circuit that has addressed mandatory detention under § 1226(c) following Zadvydas has concluded that the application of the statute violated the petitioner's due process rights. Hoang v. Comfort, 282 F.3d 1247 (10th Cir.2002), petition for cert. filed, 70 U.S.L.W. 3698 (U.S. May 3, 2002) (No. 01-1616); Kim v. Ziglar, 276 F.3d 523 (9th Cir.2002), petition for cert. filed, 70 U.S.L.W. 3655 (U.S. April 9, 2002) (No. 01-1491); Patel v. Zemski, 275 F.3d 299 (3d Cir.2001). The Seventh Circuit is the only circuit to have concluded that § 1226(c) is constitutional, and it did so prior to the Supreme Court's opinion in Zadvydas. Parra v. Perryman, 172 F.3d 954 (7th Cir.1999). I agree with the Third, Ninth, and Tenth Circuits that the Seventh Circuit's approach is no longer viable for two reasons. First, to the extent that Parra relied on the plenary powers doctrine, Zadvydas has undercut its reasoning. Second, to the extent that Parra relied on the argument that deportation is inevitable for aliens who have committed aggravated offenses, the Supreme Court in INS v. St. Cyr, 533 U.S. 289, 326, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), has undercut this reasoning by rendering discretionary cancellation of removal available for a large class of aliens who have committed aggravated offenses. Indeed, the Government in this case joined Welch's motion to set aside his most recent removal order on the ground that he is eligible for discretionary cancellation. It would thus appear that Welch has a real likelihood of avoiding deportation, further distinguishing this case from Parra.
 
 
 84
 Although the circuits that have addressed the constitutionality of § 1226(c) post-Zadvydas have agreed that it was unconstitutional as applied, they have utilized somewhat different analytical frameworks, with the Tenth and Third Circuits relying upon a fundamental rights approach, and the Ninth Circuit eschewing a fundamental rights approach in favor of the "special justification" standard set forth in Zadvydas. Kim, 276 F.3d at 530 ("Following Zadvydas, we thus must analyze § 1226(c) to determine whether the government has provided a sufficiently strong `special justification' to justify civil detention of a lawful permanent resident alien.").
 
 
 85
 For the reasons stated in Section III C. of the majority opinion, ante at 221-22, I agree that an alien's right to be free from detention pendente lite is not a "fundamental" right, which would require strict scrutiny of § 1226(c). Significantly, the Zadvydas Court did not adopt a fundamental rights approach to evaluate the constitutionality of post-removal-period detention. It suggested instead that the due process inquiry for civil detention is flexible, depending upon the alien's status and the justifications for the restraint. The Court noted that it has upheld civil, or "non-punitive," detention only in those limited circumstances where the government has provided a "special justification" outweighing the individual's liberty interest:
 
 
 86
 [G]overnment detention violates [the Due Process] Clause unless the detention is ordered in a criminal proceeding with adequate procedural protections, or, in certain special and narrow non-punitive circumstances, where a special justification, such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint.
 
 
 87
 Id. at 691, 121 S.Ct. 2491 (quotation marks and internal citations omitted). Thus, following the approach of Kim, I evaluate the mandatory civil detention authorized by § 1226(c) as applied to Welch to determine whether it is warranted by a "special justification" that outweighs Welch's constitutionally protected interest in avoiding physical restraint.
 
 III
 
 88
 Before turning to the application of this standard, I think it is important to closely examine the manner in which the reasoning of the Zadvydas Court affects our resolution of this case. After conducting this examination, it becomes clear that the due process principles upon which the Court relied compel a conclusion that § 1226(c) is unconstitutional as applied Welch.
 
 A.
 
 89
 At the outset, I note that the majority in Zadvydas rested its constitutional doubt holding in part on the stated ambiguity in the text of § 1231(a)(6). Zadvydas, 533 U.S. at 697, 121 S.Ct. 2491 (stating that the text and legislative history of § 1231(a)(6) did not provide "any clear indication of congressional intent to grant the Attorney General the power to hold indefinitely in confinement an alien ordered removed"). In § 1226(c), by contrast, Congress has unambiguously required mandatory detention pending removal proceedings. See 8 U.S.C.A. § 1226(c)(2) ("The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of Title 18" that the alien is a government witness or is assisting a government investigation (emphasis added)). Moreover, unlike the detention authorized by § 1231(a)(6), the detention mandated in § 1226(c) has an "obvious termination point" — the entry of a final order of removal.[1] Zadvydas, 533 U.S. at 697, 121 S.Ct. 2491.
 
 
 90
 While Zadvydas arguably is distinguishable on these grounds, we can glean some important constitutional principles from the reasoning of both the majority and dissenting opinions that bear on the resolution of Welch's constitutional challenge to § 1226(c). First, each separate opinion emphasized that the alien's legal status controls the extent of due process protections afforded the alien. See Zadvydas, 533 U.S. at 693-94, 121 S.Ct. 2491 (holding that the alien's status is critical to the constitutional inquiry and distinguishing between an "excluded" alien and a removable alien for purposes of the Fifth Amendment); id. at 703, 121 S.Ct. 2491 (Scalia, J., dissenting) (equating removable aliens with excluded aliens and stating that neither has a constitutional "right to release into this country"); id. at 720, 121 S.Ct. 2491 (Kennedy, J., dissenting) ("[I]t must be made clear these aliens are in a position far different from aliens with a lawful right to remain here. They are removable, and their rights must be defined in accordance with that status."). Additionally, in light of the Zadvydas majority's emphasis on the length of post removal-period detention in framing its constitutional doubt inquiry, the majority's reasoning indicates that due process does not preclude some reasonable period of detention, but rather due process enters the equation as detention becomes unreasonably protracted. Zadvydas, 533 U.S. at 699, 121 S.Ct. 2491 ("[I]nterpreting the statute to avoid a serious constitutional threat, we conclude that, once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute."); cf. Kansas v. Crane, 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002) (holding that, absent an individualized determination of "lack of control," indefinite civil commitment of a sex offender violates substantive due process); United States v. Salerno, 481 U.S. 739, 747, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (upholding pretrial detention, but stressing "stringent time limitations" derived from the Speedy Trial Act and the presence of judicial safeguards); Carlson v. Landon, 342 U.S. 524, 545-46, 72 S.Ct. 525, 96 L.Ed. 547 (1952) (upholding temporary detention of alien during deportation proceeding while noting that "problem of habeas corpus after unusual delay in deportation proceedings" was not present).
 
 
 91
 With these background principles in mind, it is important to note that Welch is a lawful permanent resident, and "[l]awful permanent residents are the most favored category of aliens admitted to the United States." Kim, 276 F.3d at 528. Welch and other lawful permanent residents retain their status until they are finally adjudged deportable. See 8 C.F.R. § 1.1(p) (2002) (providing that an alien's lawful permanent resident status terminates only upon entry of a final administrative order of deportation); Nwolise v. INS, 4 F.3d 306, 311 (4th Cir.1993) (same). Thus, pursuant to each of the Zadvydas opinions, one must conclude that lawful permanent residents detained pursuant to § 1226(c), such as Welch, are entitled to equal, if not greater, constitutional protections than the aliens detained pursuant to § 1231(a)(6).
 
 
 92
 With respect to the Zadvydas majority's reliance on the potentially indefinite duration of detention under § 1231(a)(6), the detention authorized by § 1226(c) suffers from similarly lengthy delays, a danger that stems not from lack of an identifiable termination point for the detention, but from the unclear deadline for the occurrence of that termination point.[2] For example, Welch has been incarcerated for one year and two months pending his removal proceedings, and the Government concedes that there is no likelihood that a final order of deportation will be entered in the reasonably foreseeable future. Cf. Frank Trejo, Man wins lengthy deportation battle: INS may appeal ruling on longtime resident with drug conviction, Dallas Morning News, Dec. 6, 2001, at 33A (documenting an "eight-year deportation battle" involving a longtime lawful permanent resident). Moreover, as with protracted post removal-period detention, the longer an alien is detained pursuant to § 1226(c) without being subject to a final order of removal in the reasonably foreseeable future, the less likely it is that the purpose of the detention is to aid deportation, as opposed to constituting arbitrary, capricious, or otherwise unlawful detention. See, e.g., Zadvydas, 533 U.S. at 690, 121 S.Ct. 2491 (quoting Jackson v. Indiana, 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), for the proposition that where detention's goal is no longer practically attainable, detention no longer "bear[s] [a] reasonable relation to the purpose for which the individual [was] committed.").
 
 
 93
 Significantly, there are extensive procedural safeguards attendant to post-removal-period detention, but the Zadvydas majority found these safeguards insufficient to save § 1231(a)(6) from constitutional doubt.[3] For example, before the expiration of the 90-day removal period, the INS provides for a review of the alien's record to determine whether the alien can present sufficient evidence in support of release. 8 C.F.R. § 241.4 (2001); 8 C.F.R. § 241.4(h). After the 90-day removal period has expired, the INS conducts a custody review where it considers whether the alien should remain in detention, § 241.4(k)(2)(ii); § 241.4(i)(1)-(3), considering factors such as "the detainee's criminal conduct and criminal convictions," and "[t]he likelihood that the alien is a significant flight risk," § 241.4(f). Mandatory evaluations of continued detention are then given each year, and the INS has the discretion to review the alien's detention more frequently if requested.[4] § 241.4(k)(2).
 
 
 94
 No such procedural safeguards exist in § 1226(c). The categorical bar against bail in § 1226(c) does not provide a time period for review of detention or for conducting a deportation hearing, it does not contemplate any individualized inquiry, and it does not allow for the exercise of any discretion whatsoever in determining whether continued detention is reasonable. Thus, § 1226(c) presents at least as strong a threat as § 1231(a)(6), in the form of detention lacking adequate procedural safeguards, to the liberty interest in question.
 
 
 95
 Despite the constitutional status of a lawful permanent resident, the indeterminancy of detention pending removal proceedings, and the absence of any procedural safeguards to monitor the reasonableness of continued detention, the Government argues that we must give effect to clearly-stated Congressional intent authorizing mandatory detention under § 1226(c). Although we are required to give effect to Congress's clear intent, we also are obligated to enforce the constitutional limitations on indeterminate detention recognized in Zadvydas. To this end, Zadvydas requires us to determine whether the Government has set forth a sufficiently strong "special justification" for indeterminate mandatory detention of lawful permanent residents pursuant to § 1226(c).
 
 
 96
 The Government asserts that mandatory detention is justified, regardless of its length or the status of the alien, due to the risks of flight and dangerousness to the community posed by criminal aliens facing deportation proceedings. As noted in Kim, the factual and legal bases underlying the Government's presumption that criminal aliens subject to deportation are overwhelmingly likely to flee are questionable, and such a presumption is even less reasonable when applied to a lawful permanent resident with significant ties to the community.[5] Kim, 276 F.3d at 532 (detailing flaws in report upon which the INS relies to argue that 89% of "nondetained" aliens flee and noting that removal is not "virtually certain" once removal proceedings have begun). Moreover, in light of the range of offenses subjecting an alien to deportation, the Government is unable to demonstrate that every person who has been convicted of one of the offenses subjecting him to deportation poses a particularly severe, ongoing danger to the public sufficient to justify indeterminate detention.[6] See, e.g., Zadvydas, 533 U.S. at 692, 121 S.Ct. 2491 ("[T]he alien's removable status itself ... bears no relation to a detainee's dangerousness."); Kim, 276 F.3d at 534 ("Given the range of crimes qualifying as aggravated felonies, the government simply cannot show that § 1226(c) covers only aliens who pose an especially serious danger to the public."); compare Kansas v. Hendricks, 521 U.S. 346, 368, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (upholding scheme that imposes detention upon "a small segment of particularly dangerous individuals" and provides "strict procedural safeguards"); Carlson, 342 U.S. at 538, 72 S.Ct. 525 (noting that members of Communist party were believed to be involved in ongoing activities that threatened the country's national security), with Foucha v. Louisiana, 504 U.S. 71, 81-83, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (striking down insanity-related detention system that placed burden on detainee to prove nondangerousness).
 
 
 97
 The rigidity of § 1226(c)'s detention scheme, as compared with the scheme rejected by the Zadvydas Court on the basis of constitutional doubt, combined with the constitutional status of a lawful permanent resident, compels me to conclude that § 1226(c) is unconstitutional to the extent that it authorizes, without special justification, indeterminate or unreasonably protracted detention of lawful permanent residents, such as Welch, pending removal proceedings. In the interest of giving effect to clearly-stated congressional intent to the maximum extent permitted by the Due Process Clause and to aid habeas courts in evaluating the constitutionality of continued detention of lawful permanent resident aliens, I believe that the appropriate course is to recognize a presumptively reasonable period of pre-removal-period detention for lawful permanent resident aliens, as the majority did in Zadvydas with respect to post-removal-period detention. Because the Zadvydas majority concluded that detention beyond a six-month period is presumptively unreasonable after a final order of removal is entered, I believe that the same presumption, which was predicated upon due process,[7] should apply to evaluate the reasonableness of detention for lawful permanent residents who have not yet been deemed removable. See Zadvydas, 533 U.S. at 699, 121 S.Ct. 2491 ("The basic federal habeas corpus statute grants the federal courts authority to answer th[e] question" of whether the detention exceeds "a period reasonably necessary to secure removal."); id. ("In doing so the courts carry out what this Court has described as the "historic purpose of the writ," namely "to relieve detention by executive authorities without judicial trial." ").
 
 B.
 
 98
 To provide guidance, and cognizant of the need for a uniform rule in this circuit, cf. Zadvydas, 533 U.S. at 701, 121 S.Ct. 2491 (adopting the six-month presumption and detailing its operation "for the sake of uniform administration in the federal courts"), I briefly outline what I perceive to be the appropriate role of habeas courts in the administration of the six-month presumption recognized in Zadvydas. In so doing, I note that it is impossible in this case to address all of the diverse procedural contexts in which habeas courts may be called upon to make a determination as to whether the Government has established that continued detention is supported by a constitutionally adequate special justification. I, like the majority and some habeas courts, find the issuance of a conditional writ of habeas corpus to be an appropriate means of conducting the inquiry regarding the alien's ultimate entitlement to bail. See 28 U.S.C.A. § 2243 (authorizing federal courts to "dispose of [habeas corpus matters] as law and justice require"); Patel, 275 F.3d at 315 ("We will reverse the denial of Patel's petition for habeas corpus and remand with directions that Patel be released from custody unless the government makes a prompt individualized determination whether the continued detention of Patel is necessary to prevent risk of flight or danger to the community."); see also Kim, 276 F.3d at 539 (affirming the order of the district court requiring the INS to conduct a bail hearing for Kim). Thus, I believe the best approach is for the habeas court to evaluate whether the lawful permanent resident has met his burden of establishing in the habeas petition that he has been detained for at least six months and "that there is no significant likelihood" of being subject to a final order of removal "in the reasonably foreseeable future." Absent a response from the Government establishing on its face that the Government has a special justification for the alien's continued detention, the Government would then have the opportunity at a bail hearing before an immigration judge to introduce evidence demonstrating that the alien's continued detention is warranted and is neither arbitrary nor capricious.[8] Accordingly, upon finding that an alien has been held for more than six months, that the alien is not likely to be subject to a final order of deportation in the reasonably foreseeable future, and that additional facts are needed to determine whether the special justification standard has been met, the habeas court should grant a conditional writ of habeas corpus releasing the alien unless the INS provides the alien with a bail hearing before an immigration judge to determine whether continued detention is necessary.[9]
 
 
 99
 Although the exact parameters of the Zadvydas holding are unclear, the approach that I have suggested gives effect to clearly-stated congressional intent to the extent permissible under the Due Process Clause by ensuring that a criminal alien's detention is incident to deportation, as opposed to arbitrary or capricious, while recognizing that habeas review must "take appropriate account of the greater immigration-related expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive INS efforts to enforce this complex statute, and the Nation's need to `speak with one voice' in immigration matters." Zadvydas, 533 U.S. at 700, 121 S.Ct. 2491. In the end, "courts must take appropriate account of such concerns without abdicating their legal responsibility to review the lawfulness of an alien's continued detention." Zadvydas, 533 U.S. at 700, 121 S.Ct. 2491.
 
 IV
 
 100
 Turning to an evaluation of the constitutionality of Welch's continued detention pursuant to this framework, Welch established that he was detained for over a year pending his removal proceedings. Additionally, Welch was successful in having the aggravated felony for which he originally was subject to deportation stricken from his record,[10] and at least one immigration judge in this case has found it likely that Welch will successfully achieve naturalization, meaning that Welch has demonstrated that there is "no significant likelihood of removal in the reasonably foreseeable future." Zadvydas, 533 U.S. at 701, 121 S.Ct. 2491. Indeed, as the majority notes, ante at 225, the Government concedes that Welch's removal is unlikely to occur because naturalization probably will succeed. Further, it is undisputed that Welch, as a longtime, lawful permanent resident and Navy veteran, is not a flight risk and is not a danger to society.[11] Accordingly, Welch has established that his continued confinement is presumptively unreasonable, and the Government has not responded with evidence sufficient to rebut this presumption. Given the unusually strong equities in Welch's favor, I have no difficulty concluding that his mandatory, unreasonably lengthy detention pending the entry of a final order of removal violates due process and, therefore, that the district court acted properly by granting Welch a writ of habeas corpus.
 
 V
 
 101
 In sum, although I agree with the result reached by my esteemed colleagues, my separate opinion is written in an attempt to define with greater precision the extent to which the constitutional principles underlying the Supreme Court's decision in Zadvydas compel the conclusion that § 1226(c)'s mandatory detention scheme is unconstitutional as applied to Welch. Accordingly, for the reasons set forth above, I respectfully concur in the judgment.
 
 
 
 Notes:
 
 
 [1]
 As is discussed further below,infra at 231, this distinction between § 1226(c) and § 1231(a)(6) may be more theoretical than actual, in that § 1231(a)(6) also contains a clearly-defined termination point actual removal. Neither statute, however, contains any safeguards to ensure that the "obvious termination point" will ever occur.
 
 
 [2]
 Recent inquiries by Congress and the Justice Department have highlighted the myriad problems currently facing the INS, including unreasonably lengthy delays in providing services to immigrants and in enforcing immigration lawsSee Juliet Eilperin & Cheryl W. Thompson, House is Emphatic on INS: Goodbye, Wash. Post, April 27, 2002, at A27. In part because of these problems, the House of Representatives recently voted overwhelmingly to restructure the INS, dividing it into two bureaus that would separately handle services for immigrants and law enforcement. Id.
 
 
 [3]
 Justice Kennedy's dissent relied upon these safeguards, which are absent in § 1226(c), to conclude that the detention authorized by § 1231(a)(6) was undoubtedly constitutional and, therefore, that there was no reason for the majority to refuse to give effect to Congress's clearly-stated intentZadvydas, 533 U.S. at 721, 121 S.Ct. 2491 (Kennedy, J., dissenting) ("Whether a due process right is denied when removable aliens who are flight risks or dangers to the community are detained turns, then, not on the substantive right to be free, but on whether there are adequate procedures to review their cases....").
 
 
 [4]
 Similarly, inCarlson v. Landon, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952), the Supreme Court upheld a due process challenge to a pre-IIRIRA provision governing detention of members of the Communist party pending removal proceedings, see Internal Security Act of 1950, § 23, formerly codified at 8 U.S.C.A. §§ 137 et seq. (the Act or the Internal Security Act), relying heavily on the individualized nature of the inquiry, as well as the discretion vested in the Attorney General, as central to its conclusion that the denial of bail was not violative of the Fifth Amendment. Id. at 539, 72 S.Ct. 525 ("Of course[,] purpose to injure could not be imputed generally to all aliens subject to deportation, so discretion was placed by the 1950 Act in the Attorney General to detain aliens without bail."); id. at 541-42, 72 S.Ct. 525 ("There is no evidence or contention that all persons arrested as deportable... for Communist membership are denied bail.").
 
 
 [5]
 Indeed, the INS itself "has questioned the wisdom and efficacy of [mandatory detention under] § 1226(c), and has brought to Congress' attention the need for alternative means of ensuring that aliens appear for their removal proceedings."Kim, 276 F.3d at 534-35 (citing Immigration and Naturalization Oversight Hearings on INS Reform: Detention Issues, Before the Subcomm. On Immigration of the Senate Judiciary Comm., Testimony of INS Commissioner Doris Meissner, available at 1998 WL 767401 (F.D.C.H.) (Sept. 16, 1998)).
 
 
 [6]
 For instance, a lawful permanent resident is rendered deportable by committing the crime of attempting to evade federal taxes, where "the revenue loss to the Government exceeds $10,000."See 8 U.S.C.A. § 1101(a)(43)(M)(ii). While I do not question the gravity of this offense, I question whether one convicted of such an offense invariably poses an ongoing danger to the public.
 
 
 [7]
 As noted above, supra at 230, whereas section 1231(a)(6) was determined to be ambiguous with respect to the Attorney General's "power to hold indefinitely in confinement an alien ordered removed,"Zadvydas, 533 U.S. at 697, 121 S.Ct. 2491, the text of section 1226(c) plainly mandates detention pending entry of a final order of removal. Nevertheless, as Justice Kennedy noted in his dissent, the six-month presumptive period that was read into § 1231(a)(6) by the Court "bears no relation to the text" of § 1231(a)(6). Zadvydas, 533 U.S. at 707, 121 S.Ct. 2491 (Kennedy, J., dissenting). In adopting the six-month presumptive period, the majority did not demonstrate any "ambiguity in the delegation of the detention power to the Attorney General." Id. (Kennedy, J., dissenting). Thus, the Court's adoption of the six-month presumptive period cannot be explained simply by reference to the stated ambiguity of § 1231(a)(6), but rather reflects serious doubts regarding the constitutionality of detention beyond the specified time period of six months. To the extent the presumption lacked textual grounding and was crafted to comply with due process, one would assume that due process similarly requires the application of such a presumption when analyzing a constitutional challenge to § 1226(c)'s mandatory detention provision. Cf. County of Riverside v. McLaughlin, 500 U.S. 44, 56-58, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (adopting presumption, based on lower court estimate of time needed to process arrestee, that 48 hour delay in probable cause hearing after arrest is reasonable, hence constitutionally permissible).
 
 
 [8]
 For example, where the Government has set forth in its response a supported allegation of participation in terrorism, other dangers to domestic security, or situations involving sensitive matters of foreign policy, the habeas court may determine that a bail hearing is unnecessary. These examples are not meant to be exhaustive; there might be other situations where, despite the fact that the alien has been detained longer than six months, legitimate concerns arguably justify continued detention without a bail hearing, as when a statute authorizing mandatory detention is directed at a particular subset of aliens for whom it would be reasonable to presume flight risk or dangerousness, or when a bail hearing would involve the disclosure of classified or sensitive information. Although classified or sensitive information presumably could be kept confidential by sealing documents and closing immigration hearings to the public, as the Government continues to seek increased secrecy in immigration proceedings involving immigrants detained pursuant to the September 11 attack investigation, a debate has ensued as to whether, and under what circumstances, such secrecy is warrantedSee, e.g., Detroit Free Press v. Ashcroft, 195 F.Supp.2d 937 (E.D.Mich.2002) (holding that immigration hearings may not be closed to the press or the public); Steve Fainaru, U.S. Bans the Release of Detainees' Names, Wash. Post, April 9, 2002, at A10 (detailing the Justice Department's "resolve to keep secret information about the detainees despite a growing number of legal challenges from civil liberties groups.").
 
 
 [9]
 I do not suggest that the district court, which did not have the benefit ofZadvydas's reasoning at the time it considered Welch's habeas petition, acted improperly when it directed the immigration judge to conduct a bail hearing for Welch without first evaluating the competing burdens of proof set forth in Zadvydas. Rather, I simply set forth my view of the more appropriate framework in light of the Supreme Court's approach in Zadvydas.
 
 
 [10]
 The Government now takes the position that Welch's firearms-related misdemeanor conviction renders Welch deportable, but the Government agrees that the fact that the aggravated felony was stricken from Welch's record renders him eligible for cancellation of removal proceedings by the Attorney GeneralSee 8 U.S.C.A. § 1229b(3).
 
 
 [11]
 To the extent the majority suggests that flight risk is not enough, standing alone, to justify detention pending removal proceedings,ante at 226, I respectfully disagree. See, e.g., Salerno, 481 U.S. 739, 749, 107 S.Ct. 2095, 95 L.Ed.2d 697 ("[R]espondents concede and the Court of Appeals noted that an arrestee may be incarcerated until trial if he presents a risk of flight."); Zadvydas, 533 U.S. at 722, 121 S.Ct. 2491 (Kennedy, J., dissenting) ("It is neither arbitrary nor capricious to detain the aliens when necessary to avoid the risk of flight or danger to the community."); Kim, 276 F.3d at 535 (stating that an individualized determination of flight risk would be sufficient to justify detention pending removal proceedings).